## TRENTON POTTERIES COMPANY

*v.*

## RICHARD C. OLIPHANT et al.

[Filed March 19th, 1898.]

1. Where an agreement is expressed "We, the undersigned, do business under the firm name of O. & Co.," and contains a clause "We also agree that we will not, directly or indirectly, engage in business," &c., and is signed only by the firm name, O. & Co., and has no words of severance, it is a joint undertaking that the firm of O. & Co. will not engage, &c., and not a several agreement that its component members will not.

2. Where an agreement not to compete is both joint and several that the covenantors "will not nor will either of them, directly or indirectly, engage in the business," &c., and a covenantor afterwards takes part in originating a competing corporation to engage in the business, rents property to it for that purpose, and actively participates in its management, it is a breach of the covenant.

3. Where the covenantors actively participate in the management of a business which competes with that which they sold, and which they agreed to abandon, it is a breach of the covenant, whether they participate in the new venture as principals or agents or as members of a partnership or as the employes of, or in the conduct of a corporation, as its officers.

4. Contracts in general restraint of trade—that is, restraining a man from pursuing his business anywhere in the United States—are void as against public policy.

5. Contracts in partial restraint of trade—that is, those which restrain from pursuing a business within a defined area less than the whole country—will be enforced if the space of exclusion is no wider than is reasonably required for the protection of the covenantee in the enjoyment of the business to which the covenant relates, and not so large as to interfere with the interests of the public.

Trenton Potteries Co. v. Oliphant.

6. In ascertaining whether the exclusion is wider than is required for the protection of the covenantee, and therefore uselessly in restraint of trade, each case will be considered and determined on the facts attendant upon the particular transaction.

7. The intention of the purchaser and covenantee, to produce from a plant one of several classes of goods for which it was used, does not make a covenant unreasonable which restrains the vendor from competition in the manufacture of all the classes of articles which the plant could produce.

8. It is not the intention with which the covenantee bought, but the relation of the covenant to the thing sold, which furnishes the guide by which to ascertain the reasonableness of the restraint imposed by the covenant.

9. Where the covenant as expressed is made partial in its area of restraint, only by the naming of exceptions which are colorable and pretentious, so that the covenant in fact restrains the covenantor from pursuing his business anywhere in the whole country, it is in general restraint of trade and void as against public policy.

10. Where the area within which the vendor and covenantor is excluded from competition, covers whole groups of states over which the business sold did not extend, the covenant is wider than is necessary for the protection of the covenantee in the enjoyment of the thing sold, and is void as against public policy.

11. If the covenant is expressed by the parties to exclude from the competition in several separate and distinct places, as to some of which the exclusion is reasonable while as to others it is not, the court will consider the covenant to be divisible and will enforce it within the reasonable area; but the court will not select from a contiguous area which is in itself unreasonable, such a portion as would, had it been distinctly named by the parties, have been deemed to be a reasonable extent of exclusion, and thus force the divisibility of the covenant, and compel its performance in the selected space.

12. It is the business as it existed at the time of the sale that the vendors convey, and in respect to which they covenanted not to compete, and the reasonableness of the covenant restraining the vendors from competition, will be tested by the relation of the extent of territory over which the business was done when it was sold, to the area from which they are by the covenant excluded. If they are not shut out from any more space than is necessary to enable the purchaser and covenantee to enjoy the thing sold, the covenant is reasonable and will be enforced; if they are so excluded the covenant is injurious to the public and will not be enforced.

13. The expansion of the business by purchases of like concerns by the covenantees from other parties, by increased capital and by combinations and control of production and sales, will not be considered to justify the too great breadth of the covenant when it was made.

14. Where the members of a manufacturers' association produce nearly the whole quantity of an article necessary to the comfort and health of the community, and have agreed to make their prices such as the majority of the

members shall prescribe, a scheme to buy and combine into one company the plants of a majority of the members, obtain the control of prices at which all the members shall sell, put the vendors under covenants not to compete, and thus secure the ability to dictate the prices which the public must pay for the productions of all the members of the association, is an effort to create a monopoly in an article of general necessity, and is against public policy.

15. The covenants to restrain competition, though they may be several as between the vendors and the vendee, will be considered as parts of a single plan to secure a monopoly. If they are executory a court of equity will not enforce them.

On bill, answer and proofs.

The bill of complaint in this cause was filed by the Trenton Potteries Company, a corporation of this state, as complainant, against Richard C. Oliphant, Hughes Oliphant, Robert N. Oliphant, Sidney M. Oliphant, James V. Oliphant, Samuel D. Oliphant and Henry D. Oliphant, defendants, setting up the sale by the defendants to the complainant, of the Delaware pottery and its good will and business, its recipes and formulæ by the several agreements hereinafter referred to, and charging that the defendants had thereby covenanted not to engage in the business of manufacturing pottery ware except under certain circumstances set out in the covenants and bill; and that through the pretence of the incorporation of the Bellmark pottery they had enticed away the employes of the complainant and induced them to work for the Bellmark Pottery Company, and were manufacturing pottery ware in breach of their covenants with the complainant, and praying that the defendants and each and every one of them may be enjoined from engaging directly or indirectly in the business of the manufacture of pottery ware, save in the capacity of agents or employes of the complainant, excepting within the territory and the time specified in the covenants, and from using the complainant's recipes and formulæ.

The defendants file their joint and several answers to the bill. They deny that James V. Oliphant ever made the covenants not to engage in the business. They admit that the original agreement for the sale of the Delaware pottery, &c., which was dated January 23d, 1891, and which is hereinafter called an option, was made

by Richard C. Oliphant, acting for the firm of Oliphant & Company, but they deny that James was then a member of the firm. They also admit the execution of the other agreements hereinafter set out, by all the defendants except James. They admit the sale and conveyance of the Delaware pottery with its equipments and good will, recipes and formulæ to the complainant, by intermediate conveyances through Mr. Tapscott and Mr. Hancock. They also admit that all the defendants, excepting James, made the covenant hereinafter referred to, dated July 6th, 1892, agreeing not to engage in the business of the manufacture of pottery ware within any of the states of the United States except, &c., but aver that it is void, because it is in restraint of trade. They admit the employment of the defendants by the complainant company after the purchase of the defendants' pottery, and that they quit the complainant's service at varying periods from June to September, 1893. They deny that while they were in the complainant's employ they entered into any combination to engage in the pottery business contrary to their covenants, or to promote a company to be incorporated for that purpose, and say that they had no connection with any pottery business other than complainant's, until after they had severed their connection with the complainant. They deny that they enticed away the complainant's employes, and that the Bellmark pottery was not incorporated in good faith. They admit that since quitting the complainant's service Hughes, Robert N., Sidney M. and James V. Oliphant, have been employed by the Bellmark pottery, and that Samuel D., Hughes and Sidney M. Oliphant, rent to that company its real estate and hold stock in it. They deny that either Richard C. or Henry D. Oliphant, has ever, since their connection with the complainant company, been engaged in any way in any pottery business, and state that Samuel D. Oliphant has had no other connection with that business than as holder of stock in the Bellmark pottery, and lessor to that company of the lands which it occupies. They deny that any recipe or formula ever used in the Delaware pottery, has ever been used in the Bellmark pottery, but they admit that the Bellmark pottery has sold its product to dealers who have heretofore

dealt with the Delaware pottery. They set forth the ages of the defendants to show the unreasonableness of the covenant restraining them for fifty years from engaging in the pottery business, reciting that Samuel D. Oliphant, the father, is now sixty-nine years old, and his sons, the other defendants, are from twenty-six to thirty-eight years old. They allege that the exception of Arizona and Nevada from the area within which the defendants are by the covenant prohibited from engaging in manufacturing pottery, was made for the purpose of giving the covenant the appearance of being limited to a less space than the whole United States; that the Delaware pottery, when sold by them, was engaged in making only druggists' and sanitary ware, and that the production of druggists', sanitary, crockery, terra-cotta and tile are each separate branches of the pottery business not in competition with each other.

They further reply that sanitary ware is an article of prime necessity; that when the complainant company was formed, sanitary ware was made by only seven factories in Trenton, one in Baltimore and one in Tiffin, Ohio; that these produced ninety-four per cent. of all the sanitary ware output, and they state that the complainant company was formed for the purpose of obtaining a monopoly of the manufacture of sanitary ware, and to suppress competition in the sale thereof; that the complainant obtained the covenants sought to be enforced, restraining the defendants from engaging in the manufacture of pottery, in aid of an unlawful purpose to secure a monopoly of the manufacture of sanitary ware; that they at the same time took like covenants against competition, from every other sanitary pottery in Trenton except one, and sought to secure that one; that the defendants did not wish to give an option and join the combination, but they were told by the agents of the complainant company that the other sanitary pottery proprietors had already signed such options or were about to do so, and that the Delaware pottery should not stand out against the combination and compete in business with them. They further aver that the promoters of the complainant company, as part of their scheme to obtain a monopoly of the sanitary pottery business, secured the control

of the Brewer pottery, at Tiffin, Ohio. They insist that the complainant company seeks to enforce the covenants restraining the defendants from engaging in the manufacture of pottery as part of the scheme to monopolize the sanitary pottery business, and that those covenants are, for the reasons stated, in restraint of trade and void and non-enforceable.

This case is, in some particulars, one of first instance in New Jersey in the application of the law concerning the enforcement of covenants which are claimed to be in restraint of trade and to aid the creation of a monopoly. The evidence shows these facts which gave rise to the disputes between the parties referred to in the pleadings in the cause.

In the latter part of the year 1890, and in the month of January, 1891, there were engaged in the business of the manufacture of sanitary pottery ware (under which general designation were included sinks, urinals, water-closets and the like), eight different potteries, the Equitable, Enterprise, Crescent, Delaware, Empire, Willet's, Maddock's and the Maryland. All except the Maryland were located in Trenton, New Jersey; the Maryland was at Baltimore. These eight potteries comprised all of the potteries in the United States which were then engaged in the production of sanitary ware (except a small concern at Wellsville, Ohio), and had formed an association called the American Sanitary Potters' Association, for the purpose of securing uniform action as to the prices of the ware which they manufactured and sold. The prices at which the goods produced by the associated concerns should be sold were fixed by a majority vote of the several members. Each pottery had its individual vote in the association, and the vote of the majority controlled, and all were by their agreement bound to sell only at the prices that the association should fix. The several potteries comprising the association were separately and independently owned; all of them were in partnership or individual ownership, except the Crescent, which was a corporation.

At this time Mr. T. L. Tapscott was a broker in the city of New York, who had organized the New York Biscuit Company, a combination of several concerns in one corporation, and who

had also had some relations with the Diamond Match Company, another combination. In 1890 Mr. Tapscott's attention was called to these potteries by one of the parties who had been connected with the biscuit company, and it was suggested that he "undertake" the Trenton potteries. He sought a conference with and saw Mr. Skirm, of the Enterprise pottery, and Mr. Magowan, of the Empire, and on receiving assurances from one of them that he would sell his pottery and could get options on others, he asked them to obtain them. Mr. Tapscott then sought to interest some of the capitalists who were in the Diamond Match Company, but the scheme at this time seems to have lagged because the capitalists refused to go further. Several months later, in 1890, Mr. Tapscott succeeded in interesting Mr. Davison, a New York lawyer who controlled considerable capital, and after a conference between Tapscott, Davison and Skirm, the former wrote up options for the purchase of the potteries and gave them to the latter to procure signatures. Mr. Tapscott testifies that Skirm succeeded in getting perhaps five of the options signed, but he did not think he got "Willets'," who "were making very little sanitary; they make mostly bric-a-brac." The latter statement is significant, as it shows that, at this early date, the plan in view was not the purchase of potteries generally, but of those potteries which produced sanitary ware, and "Willets'" was of no special importance, as they were making very little sanitary ware. Among these earlier options obtained by Mr. Skirm was one from the Oliphants (the defendants), for the purchase of the Delaware pottery. These options were not properly signed and seem to have been abandoned.

Mr. Tapscott, however, had not given up the scheme. He was introduced by Mr. Davison to Mr. Bayne, his brother-in-law, as a party who would take part in the negotiations, and further conference was had, resulting in a meeting at Mr. Skirm's house, at which it was proposed to get properly-signed options, with the amount of the price left blank, so that it could be filled in with a sum sufficient to cover the expenses, &c., of the managers of the scheme. These latter options they obtained

Trenton Potteries Co. *v.* Oliphant.

from the owners of the Enterprise, Empire, Crescent, Equitable and Delaware potteries, all dated January 23d, 1891. The following is a copy of the option then given by Oliphant & Company upon their Delaware pottery:

"TRENTON, N. J., January 23d, 1891.

"*F. L. Tapscott, Esq.:*

"DEAR SIR—We, the undersigned, do business under the firm name of Oliphant & Company and own and control the Delaware pottery. We own good will, brands, patents, moulds, designs, horses, wagons, trucks, tools and all necessary implements used in our pottery business, and have the right to carry on a general business in the manufacture and sale of clay products.

"We will sell the plants, consisting of land, buildings and fixed machinery, which, it is understood, includes all the real estate, together with all the good will, brands, patents, trade-marks, designs, moulds and all other appurtenances in any way connected with the real estate or the business of our firms, with the right to use our or their names, for the sum of $406,000.

"We will also turn over to you guaranteed book accounts and cash to the extent of $36,300; also stock, both manufactured, unmanufactured and in process of manufacture, to the extent of $69,700; both of these latter amounts are included in and form part of the price aforesaid, to wit, $406,000. The items, which include book accounts, cash, stock, both manufactured, unmanufactured and in process of manufacture, may be modified after actual examination and accordingly increased or decreased, as such examination shall at that time disclose the fact to be, and said increase or decrease added or deducted from the price, as the case may be.

"On demand and the tender to us as above, at any time within ninety days from January 23d, 1891, we agree to transfer to you legally, free and clear of all encumbrances or debts of any kind, all the above-named properties, including their and our good will, plants, brands, patents and right to use their and our names, and all other property in any way connected with said business.

"This option is to run to you or your assigns.

"For and in consideration of the sum of one dollar to us in hand paid, the receipt of which is hereby acknowledged, you shall have the sole and exclusive right or option to buy the business as aforesaid for the term of ninety days from date, and if at the expiration of said term of ninety days you have not made demand on us nor notified us of your intention to exercise this option and demanded that we transfer to you properties as above, then this option shall be null and void, and this paper shall be returned to us and canceled.

"We also agree that we will not, directly nor indirectly, engage in the business of the manufacture of pottery ware except in the capacity of your agent or employe or as your assigns, within any state in the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona, for a period of fifty years from this date.

"The foregoing option is executed upon the sole condition, and is not to be

operative in any event unless complied with—that is, at the time you or your assigns may elect to accept the said option and ask for an examination of the books and accounts of said business, you will deposit with us two and one-half per cent. of the purchase price aforesaid, in cash, as an earnest of good faith and as a forfeit to be retained by us if the statements which we have this day made to you in writing are found to be substantially as represented and you fail to complete the purchase.

"In witness whereof we have hereunto set our hands and seals this 23d day of January, 1891.

                                        "OLIPHANT & Co.  [L. S.]
"Witnessed by
   "CHAS. H. SKIRM."

The options of January 23d, 1891, obtained from the four other pottery-owners were the same as the above, save that the clause by which the givers agree not to engage in business is varied, in two of them, from that above taken from the Delaware pottery. The Crescent was a corporation, and, by the clause of restraint in that option, the covenantor agreed that it would not engage in the business of the manufacture of pottery ware "*now made by the five potteries of which this is one,*" except, &c. The Equitable pottery clause on this subject, only bound the covenantors not to engage in the manufacture of "*sanitary* ware, except," &c. Another indication that the object was to secure the sanitary-ware potteries.

At the same time that the options were obtained—January 23d, 1891—a circular letter of inquiry was prepared by Davison, for answer by the pottery-owners, addressed to Tapscott, and one question asked of the owners was, "Will you take part of the purchase-money in *stock of the new company;* if so, what amount?" This inquiry, almost at the inception of the dealing, indicates that the parties then contemplated the formation of the new company, in which the owners of the combined potteries might take stock. That this was a continued design is further shown by the letter of Oliphant & Company, dated May 2d, 1892, to Mr. Tapscott, making their change of price and acceptance of the company's stock, conditional upon an issue of preferred and common stock only to the amounts named in their letter, and the final execution of the purpose is shown by the subsequent incorporation of the complainant, the Trenton Pot-

teries Company, with power to issue common and preferred stock, exactly in accordance with the amounts indicated by these precedent references.

It should be observed that this proffer of an agreement to sell the Delaware pottery is made in terms by a partnership, is signed only in the partnership name, and, as to all things agreed to be done or to be avoided, is a joint agreement and not several, and relates to the acts which the partnership, as such, agrees it will or will not do. So the clause agreeing not to engage in business in the manufacture of pottery is joint, and appears to be an undertaking by the firm that it will not engage in such business, &c., but not an engagement that its several members shall not separately so engage.

On February 6th, 1891, within two weeks after securing this option of January 23d, 1891, Mr. Tapscott assigned it, with the others, to Mr. Davison, who, on the same day, assigned them to Mr. Bayne. This was probably done to enable the options to be offered for sale abroad, and for this purpose Mr. Bayne took certified copies of them to Europe. The assignments are absolute, and appear to divest Mr. Tapscott of all interest in the option, but he still continued to assume to deal with them as if he were the sole owner, and his authority so to act was never questioned by anyone.

Mr. Bayne's mission to sell the options in Europe was a failure, and they then turned their attention to securing American capital to aid them to carry forward the venture. Considerable time elapsed while these efforts were being made, and the three months' limitations named in the options had expired. The firm of Oliphant & Company, which at the time of the giving of the Delaware pottery option of January 23d, 1891, consisted of Samuel D., Richard C., Hughes and Henry D. Oliphant, had about January 1st, 1892, received as additional members Robert N., Sidney M. and James V. Oliphant. It became necessary, if anything more were to be done, to have a renewal of the expired options. Mr. Tapscott, on February 1st, 1892, obtained this as to the Delaware pottery by a letter of that date, addressed to him, in these words :

44

"Delaware Pottery.

"Oliphant & Co., Manufacturing Potters.

"TRENTON, N. J., February 1st, 1892.

"*F. L. Tapscott, Esq.*:

"DEAR SIR—In consideration of one dollar, to us in hand paid, the receipt of which is hereby duly acknowledged, we extend the option heretofore given to you on our pottery for ninety days from date.

"This extension to be attached to and become part of the original option.

| "Witnessed by | (Signed) |
|---|---|
| "Robert N. Oliphant as to | RICHARD C. OLIPHANT, |
| "Hughes Oliphant. | HUGHES OLIPHANT, |
| "Witnessed by | ROBERT N. OLIPHANT, |
| "Richard C. Oliphant as to | JAMES V. OLIPHANT, |
| "Robert N. Oliphant, James V. | S. M. OLIPHANT, |
| "Oliphant and S. M. Oliphant, | HENRY D. OLIPHANT, |
| "and Hughes Oliphant. | S. D. OLIPHANT. |
| "Witnessed by | |
| "Lewis W. Scott as to Henry D. | |
| "Oliphant and S. D. Oliphant." | |

Like extension renewals were obtained from the other pottery-owners.

Mr. Tapscott, after considerable effort, finally succeeded in interesting Mr. Morse, who was associated with the bankers, A. M. Kidder & Company, in the proposed purchase and took him to Trenton, where he made a superficial outside examination of the potteries. From this time until the final consummation of the purchase on the formation of the Trenton Potteries Company, the complainant, the management of the plan of purchase seems to have rested with Mr. Tapscott (in whose name all the options and extensions were taken), Mr. Bayne, Mr. Davison and Mr. Morse, who was associated with the bankers, A. M. Kidder & Company.

On May 2d, 1892, Mr. Tapscott received from Oliphant & Company the letter above referred to, agreeing that if

"the capitalization does not exceed $1,250,000 pref. eight per cent. stock and $1,750,000 common stock we agree to accept $116,000 payable in cash and $103,000 payable in common stock making a total price of $219,000 'including however' only $50,000 of the guaranteed assets referred to in our option."

A certificate under date of May 3d, 1892, was addressed to Mr. Tapscott by Oliphant & Company, stating their net profits

for the preceding three years, and valuing their real estate, plant and appurtenances at $200,000, with an offer that several members of their firm would, if desired, become connected with "the new company to be formed." In this certificate there is also an extension of the option to enable Tapscott "to make examinations, organize company," &c. Like certificates were obtained about the same time from the four other owners. The same words are used in all of them, except as blanks have been filled by the different parties with varying sums applicable to each. Several are in the same handwriting, and it is quite plain that they all came originally from Mr. Tapscott, as one of the steps necessary to the consummation of the purchase of the sanitary potteries.

On May 10th, 1892, Oliphant & Company acknowledged the deposit of $2,900 by Mr. Tapscott and his associates with the New York Guaranty and Indemnity Company, to be forfeited to Oliphant & Company if the purchasers defaulted.

On May 20th, 1892, Tapscott accepted the option for the purchase of the Delaware pottery and notified the Oliphants. On May 21st—the next day—they acknowledged notice of the exercise of the option and confirmed it. The signatures to this acknowledgment were Oliphant & Company, and all the members of the firm except James.

On May 21st, 1892, an agreement for the sale was made, the opening paragraph of which is as follows :

"This agreement made and entered into this 21st day of May, 1892, between Oliphant & Co., owners of the Delaware pottery, party of the first part, and Frank L. Tapscott, of the county of Kings, State of New York, party of the second part, witnesseth."

The agreement then proceeds reciting the option of January 23d, 1891, and Oliphant & Company covenanted to sell and convey the Delaware pottery, its real estate, plant, good will and appurtenances, &c., to Tapscott or his assigns upon ten days' notice, and to execute and deliver such papers as may be necessary to complete the conveyance "and such other papers as may be necessary to carry out the terms and conditions of such other agreements as we have heretofore executed." Tapscott agreed

to pay the price, $259,125.31, of which $103,000 was to be in "the common stock of the company to be formed by the purchaser of said property." This agreement was signed by Tapscott and also "Oliphant & Co.," and by all the members of the firm except James. By a separate memorandum, dated May 23d, 1892, also under seal, and signed by James, he agrees "to all the terms and conditions mentioned and set forth in the agreements signed by the other owners of said pottery."

Corresponding agreements, with slight and unimportant variances, were taken by Tapscott from the owners of the four other sanitary potteries, and he thus obtained the control of the purchase of the whole five, and power to direct their conveyance to whom he would, some upon two and others on ten days' notice to be given by him. Having the purchase thus secured, they were ready to organize the purchasing company, and put its stock on the market.

Before the final option of May 23d, 1892, was given, Messrs. Bayne and Tapscott had practically concluded their negotiations with the bankers, A. M. Kidder & Company, to finance the venture. On May 25th, 1892, a prospectus was issued, inviting the purchase of the stock of the new company by the public. This prospectus was "got up" by the bankers, was perhaps shown to the vendors, and was circulated generally wherever it was thought purchases of the new stock could be induced. It stated that

"these five companies manufacture and sell about seventy-five per cent. of the entire output of the famous sanitary plumbing ware made in this country; * * * they are of absolute necessity to the community and are in constantly increasing demand. * * * Those who retire [referring to the vendors] do so under contract not to engage directly or indirectly in any competing business."

The Trenton Potteries Company, the complainant in this suit, was, by a certificate dated the 27th day of May, 1892, and filed in the secretary of state's office on the 28th of that month, incorporated under the General Corporation act of this state. Its capital stock was fixed to be issued, $1,250,000 of preferred stock and $1,750,000 of common stock. Its objects were stated to be

"to manufacture, buy, sell and trade in pottery and earthenware and other like products, and in all materials commonly or conveniently used, manufactured, bought and sold in connection therewith, or necessary or convenient in and about the transaction of the said business."

The final conveyances under the agreements of sale were dated July 6th, 1892. Those conveying the Delaware pottery and plant were executed in several different instruments all of the above date, but none of them were signed by James V. Oliphant. It is undisputed that the full consideration agreed to be paid has been received by the owners of the Delaware pottery.

One of the conveyances transfers to Tapscott "all the plant, machinery and appurtenances of the Delaware pottery, in Trenton, New Jersey, together with all the good will, &c., tools, implements," &c. This purports to be made by the several members of the firm "doing business under the firm name of Oliphant & Co.," but is signed Oliphant & Company, Richard C. Oliphant, Hughes Oliphant and S. D. Oliphant. This instrument contains a joint covenant "to warrant and defend the sale of the said property hereby sold" against all persons.

Another, of the same date, purporting to be made by "we, the undersigned," conveys to Tapscott all recipes and formulæ for the bodies of the ware that is now being produced at said pottery, &c., also glazes, colors and mixtures, &c., with an agreement that Tapscott shall have the exclusive use of the same, and that their verity shall be established by an affidavit of the undersigned, and that Tapscott may retain $10,000 of the Oliphant stock until a test can be made of the genuineness of the recipes and formulæ. This is signed Oliphant & Company and by all the members of the partnership except James.

By a deed dated July 6th, 1892, Richard C., Hughes, Henry D. and Samuel D. Oliphant, who held the title to the real estate on which the Delaware pottery was located, joined with their wives in conveying it to William S. Hancock for the benefit of the complainant, the Trenton Potteries Company, and Hancock, by a deed of the same date, immediately conveyed the premises to the complainant.

In addition to the above-recited conveyances another was made, which contains the covenant of restraint, which is the subject of contention in this cause. It is in these words:

"This agreement, made and entered into this sixth day of July, 1892, between Richard C. Oliphant, Hughes Oliphant, S. D. Oliphant, Henry D. Oliphant, Robert N. Oliphant, S. M. Oliphant and James V. Oliphant, doing business under the firm name of Oliphant & Co., of Trenton, New Jersey, parties of the first part, and Frank L. Tapscott, of the county of Kings, State of New York, party of the second part.

"WHEREAS, The parties of the first part heretofore contracted to sell their certain pottery, located in the city of Trenton, New Jersey, to the party of the second part, and in consideration of said purchase by said party of the second part did agree with said party of the second part and his assigns, as hereafter in this agreement set forth; and

"WHEREAS, The party of the second part has conveyed the said pottery or caused the same to be conveyed to the Trenton Potteries Company;

"Now therefore, in consideration of the premises the said parties of the first part do hereby jointly and severally agree that they will not nor will either of them, directly or indirectly engage in the business of the manufacture of pottery ware, except in the capacity of agent or employe of the Trenton Potteries Company, or as its assigns, within any State in the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona, for a period of fifty years from this date, and that this contract shall enure to the benefit of and may be enforced by the said Trenton Potteries Company, its successors or assigns.

"And the said Richard C. Oliphant, one of the parties of the first part, does hereby further covenant and agree that he will, if desired by the Trenton Potteries Company, and so long a time as said company shall so desire, not exceeding five years, remain as manager of said pottery at a salary of three thousand dollars for the first year, and thereafter at such a salary as may be fixed by the Board of Directors.

"In witness whereof, the said parties of the first part have hereunto set their hands and seals the day and the year first above written.

"S. D. OLIPHANT. [L. S.]
"RICHARD C. OLIPHANT. [L. S.]
"HUGHES D. OLIPHANT. [L. S.]
"HENRY D. OLIPHANT. [L. S.]
"S. M. OLIPHANT. [L. S.]
"ROBERT N. OLIPHANT. [L. S.]

"In presence of—

"As to S. D. Oliphant, Richard C. Oliphant and Hughes Oliphant—LEWIS CASS LEDYARD.

"Witness as to Henry D. Oliphant—CHARLES S. CHEVRIER.

"Witness as to S. M. Oliphant—JOSIAH HOLLIES.

"Witness as to Robert N. Oliphant—A. R. CHAMBERS."

It will be noticed that James V. Oliphant did not sign this instrument.

By another conveyance of the same date, July 6th, 1892, Mr. Tapscott conveyed all the plant, machinery and appurtenances of the Delaware pottery, its good will and equipments, which had been conveyed to him, to the complainant, the Trenton Potteries Company.

On the organization of the complainant company, the defendants Richard C., Hughes, Robert N., Sidney M. and James V. Oliphant entered into its employment in various capacities, and continued in its employ until the latter part of August or the first part of September, 1893, when they quit the service of the complainant.

In the latter part of September, 1893, John C. Oliphant and Samuel D. Oliphant, Jr., sons of the defendant Samuel D. Oliphant, and brothers of the defendants, and one Patrick Moohan, organized a pottery company, under the General Corporation act of this state, called the Bellmark Pottery Company. The certificate of incorporation was filed in the secretary of state's office on October 9th, 1893, and declared that the objects for which the company was formed were to

"manufacture and sell all kinds of novelties, specialties and staple ware, or other goods, merchandise, or products made of earthenware, wood or metal or any combinations thereof."

Mr. John C. Oliphant was chosen president of the new company, Mr. Alexander C. Oliphant, another brother, secretary and treasurer. These persons had not been members of the firm of Oliphant & Company nor were they parties to the covenants under consideration. The defendants Samuel D. Oliphant, Hughes Oliphant, Sidney M. Oliphant and Robert N. Oliphant all became stockholders in the new company. Hughes, Sidney M., Robert N. and James V. Oliphant took active employment in the Bellmark company's business in various capacities. Mr. Robert N. Oliphant testifies that the production of the Bellmark pottery is earthenware, pottery ware and sanitary ware, of the same shapes, to some extent, as were made at the Delaware pottery; and that sales of these products were made to some of the

same people to whom they used to sell when they were running the Delaware Pottery Company. Mr. Alexander C. Oliphant, speaking of the business of the Bellmark pottery, also testifies that "all of the stockholders were in active participation in the management of the firm." Its factory when visited showed that it was engaged in the production of sanitary ware in quantities; and personally and by letter, trade was solicited for the sale of sanitary ware and druggists' supplies, from persons who had been customers of Oliphant & Company when they were manufacturing like articles at the Delaware pottery, before they sold it to the complainant.

*Mr. James Buchanan, Mr. William M. Lanning, Mr. Garret D. W. Vroom* (with whom was *Mr. Lewis Cass Ledyard,* of New York), for the complainant.

*Messrs. Lowthorp & Oliphant, Mr. Richard V. Lindabury* (with whom was *Mr. Joseph H. Choate,* of New York), for the defendants.

GREY, V. C.

Before entering upon the consideration of the construction of the covenants in dispute, I will review the evidence upon the issue raised by the denial of James V. Oliphant that he made them.

The first agreement not to engage in the manufacture of pottery ware was that contained in the option given by Oliphant & Company to Mr. Tapscott dated January 23d, 1891. This instrument is in the form of a letter, opening: "Dear Sir—We, the undersigned, do business under the firm name of Oliphant & Company, and own and control the Delaware pottery," &c. The letter proceeds with an offer to sell the Delaware pottery and its good will, equipments, &c., giving Mr. Tapscott an option to buy within ninety days from date, and then follows this clause:

"We also agree that we will not, directly or indirectly, engage in the business of the manufacture of pottery ware except in the capacity of your agent or employe or as your assigns, within any state of the United States of America or within the District of Columbia, except in the State of Nevada and the Territory of Arizona, for a period of fifty years from this date."

Trenton Potteries Co. v. Oliphant:

The letter is signed "Oliphant & Co." At the time this letter was written James V. Oliphant was not a member of the firm of Oliphant & Company. He is not shown to have taken any personal part in the giving of this option. It seems clear that when it was given he was no party to it. The exercise of the option was delayed for more than a year. Meanwhile, in January, 1892, James had become a member of the firm. Afterwards, on February 1st, 1892, James joined with his fellow-members of the firm in a letter to Mr. Tapscott, extending the option and declaring "this extension to be attached to and become a part of the original option." The effect of this extension was a recognition and ratification of the original option by James as binding upon him. On May 23d, 1892, James executed a separate paper, under seal, reciting notice of Tapscott's exercise of the option and purchase of the Delaware pottery, of which he (James) was a part owner, and declaring, " I hereby agree to all the terms and conditions mentioned and set forth in the agreements signed by the other owners of the said pottery."

The above named were the only instruments connected with these transactions which James V. Oliphant is shown to have executed. By their terms James assented to the sale and agreed to be bound by the terms and conditions of the agreements which had been signed by the other owners. I do not understand that any of these papers signed by James conferred any authority upon the other members of the firm to bind him to any new agreements differing from the original option, in the terms proffered. The language used is that of ratification and approval of what had been done, and not of undertaking to be bound by any different contract which the other owners might make in the future.

The instruments noted being the only ones which obligated James, and binding him only as to agreements which on or before May 23d, 1892, the other owners of the Delaware pottery had signed, what had the others of the firm done at or prior to May 23d, 1892, to bind themselves not to engage in the manufacture of pottery, &c. ? The only agreement on this subject was the clause in the original option of January 23d, 1891,

above recited.  This was a promise of Oliphant ·& Company
that they, Oliphant & Company, would not engage in the manu-
facture of pottery ware, and related to a sale of the firm prop-
erty, to protect which the agreement was made.  It was in form
a joint agreement by the firm, containing no words of severalty,
and was signed by the firm name.  Where two or more persons
make a contract, if there be no express words of severance the
general presumption of the law is that the contract is joint.
*Alpaugh* v. *Wood, 24 Vr. 644.*  In the agreement of January
23d, 1891, there are no words of severance whatever.  I think
it must be taken to have been an agreement that the firm, as
such, would not engage in the manufacture, &c.  This was the
only covenant not to engage in business, &c., which James ever
accepted and ratified.

There is no pretence either in the pleadings or proofs that the
partnership of Oliphant & Company, acting as a firm, has ever
engaged in the manufacture of pottery ware in breach of its
agreement in the original option.  Any grounds upon which
James can be individually bound not to so engage, &c., must be
based upon the subsequent agreement and covenant of July 6th,
1892.  This was a new agreement under seal, purporting to
be made between Richard C., Hughes, Samuel D., Henry D.,
Robert N., Sidney M. and James V. Oliphant, "doing business
under the firm name of Oliphant & Co., of Trenton, N. J.," and
Mr. Tapscott.  This agreement contains this clause :

"Now, therefore, in consideration of the premises, the said parties of the
first part do hereby jointly and severally agree that they will not, nor will
either of them, directly or indirectly, engage in the business of the manufac-
ture of pottery ware, except in the capacity of agent or employe of the Tren-
ton Potteries Company, or as its assigns, within any state in the United States
of America, or in the District of Columbia, except in the State of Nevada and
the Territory of Arizona, for a period of fifty years from this date, and that
this contract shall enure to the benefit of and may be enforced by the said
Trenton Potteries Company, its successors or assigns."

Although in its statement of parties James V. Oliphant is
named as a party to this covenant, he did not, in fact, sign it.
The signatures are the individual signatures of the other mem-

Trenton Potteries Co. *v.* Oliphant.

·bers of the firm, and not even the firm name of "Oliphant & Co." is signed. James did not sign it himself nor did anyone assume to sign it for him in his name. Nor does it anywhere appear that James has bound himself by its terms. This new covenant of restraint is far wider in its operation upon the individuals bound by it than the clause of restraint contained in the original option. This purports to restrain the parties, jointly and severally, from engaging in the manufacture of pottery. It binds them all when associated together, and it binds each when acting in his individual capacity. The former one restrained only the firm from engaging, as a partnership, in the manufacture of pottery ware. This restrains each several member from separately, personally, so engaging.

In my judgment, it has not been shown that there has been any breach of the agreement of restraint contained in the option of January 23d, 1891, which was assented to by James V. Oliphant.

As to this later covenant of July 6th, 1892, I think it is in no way binding upon him, as he neither executed it, authorized it nor assented to it, and his separate memorandum of May 23d, 1892, whereby he agreed to all the terms and conditions mentioned in the agreements signed by the others, must be related to such agreements as had been made by the others, prior to that date, and cannot be construed to bind James to an agreement of an essentially different character, made weeks after that date, which he did not execute or authorize, and which he has not ratified.

As to the claim that the defendants broke their covenant not to use the recipes and formulæ they sold to the complainant, the evidence seems to be quite insufficient to support the relief asked. The proof is that the Bellmark pottery purchased its recipes from Mr. Moohan, one of its incorporators.

Another preliminary question which may be disposed of is raised by the contention of the defendants that even admitting the validity of the covenant of July 6th, 1892, they deny that the defendants Richard C. or Henry D. Oliphant have engaged

in the business of the manufacture of pottery ware in any capacity whatever.

This denial puts upon the complainant the burden of proving that these defendants did engage in that business in breach of the covenant. There is no evidence in the case which goes to show that either of these defendants has, since the making of the covenant of July 6th, 1892, engaged in the business of the manufacture of pottery ware. The only allegation in the bill of any breach of the covenant is that the defendants broke it by originating the Bellmark pottery, and through this means engaging in the business of manufacturing pottery ware. Richard C. Oliphant, in his testimony, denies any connection whatever with the Bellmark pottery. There is no showing that, since July 6th, 1892, the defendant Henry D. Oliphant has had any connection with that undertaking.

I think there is an entire failure to show any engagement by either Richard C. or Henry D. Oliphant in the manufacture of pottery ware since July 6th, 1892.

The defendants also deny that Samuel D. Oliphant had any connection with the pottery business save as the owner of stock in the Bellmark pottery, and as a landlord demising to that company the lands whereon it conducts its business. On the other hand, the complainant contends that Samuel D. Oliphant and the other covenantors, presented John C. and S. D. Oliphant, Jr., as the apparent incorporators of the Bellmark Pottery Company because they had not made any covenant not to engage in the pottery business, while in fact the real incorporators were Samuel D. Oliphant and those of his sons who had made the covenant.

The proofs on this point show that the Bellmark pottery was incorporated in September and October, 1893, by Samuel D. Oliphant, Jr., John C. Oliphant and P. H. Moohan. Mr. John C. Oliphant, who was the holder of four shares of Bellmark (which were not paid for), was made president. The interest of Mr. S. D. Oliphant, Jr., is not shown.

The testimony of Mr. Robert N. Oliphant shows that by the original contract for the creation of the Bellmark Pottery Com-

pany, S. D. Oliphant, Robert N. Oliphant, Sidney M. Oliphant, Hughes Oliphant and P. H. Moohan each agreed to take a one-fifth share. Mr. A. C. Oliphant, who had come to be owner of one share, to be paid for in services, became secretary and treasurer. Both of the officers of the new company were sons of Samuel D. Oliphant and brothers of the other defendants who invested their money, but neither of these officers had made the covenant of July 6th, 1892, not to engage in the pottery business. Mr. Robert N. Oliphant testifies that Mr. John C. Oliphant lived in Ohio, and had not been in Trenton between June 19th, 1895, and the previous fall, and that he gave no attention whatever to the business. Robert further testifies that though Alexander's single share of stock (which was of the par value of $100 as appears by the certificate of incorporation) was to be paid for by services, he had not fully paid for it at the time of taking the testimony, June, 1895. Until June 15th, 1895, long after the bill in this cause was filed attacking the *bona fides* of the Bellmark company, Mr. A. C. Oliphant testifies there had been no board of directors of that company. The land on which the Bellmark pottery was located was owned by Samuel D., Hughes and Sidney M. Oliphant, by an unrecorded deed. There was no lease executed by them to the Bellmark Pottery Company, but they received a rental of eight per cent. on the stock of the company, paid in quarterly sums of $1,000 each.

It would naturally be difficult to understand how, without a board of directors, the affairs of a corporation could be carried on, which was incorporated in October, 1893, and immediately engaged in active business, and continued it until June 19th, 1895, when the witness testified as to this extraordinary condition of affairs. But Mr. A. C. Oliphant, the secretary and treasurer of the company, explains this by testifying that "all of the stockholders were in the active participation in the management of the firm; in any formal matters the officers met for that." It it quite apparent from the testimony of the Oliphants that Mr. S. D. Oliphant was one of those who actively engaged. in the management of the new concern, as one of these stock-

holders. He himself, though sworn as a witness, does not deny the statement of his son Robert that he was one of the originators of this new pottery company which has come into direct competition with the purchaser of the Delaware pottery, nor that he took an original one-fifth share in its stock, nor the statement of his other son, A. C. Oliphant, that all the stockholders actively participated in the management of the new pottery business. The answer admits that he was a stockholder in the Bellmark. It is significant, I think, that when Mr. A. C. Oliphant was questioned as to its affairs as a " company," he in his answer uninvitedly designated it as a " firm."

If the sole connection of the defendant S. D. Oliphant with the business of the Bellmark pottery were simply that of a holder of its capital stock and a lessor of the land it occupies, it might be questioned whether these acts were in themselves an engaging in the business of manufacturing pottery ware, for a man might lease land to a corporation or purchase and hold its stock without so engaging in the actual conduct of its affairs that the company would receive the benefit of his previous experience in the business in which it is engaged, or of his acquaintance with the trade in the goods produced; but however this might be, should it appear that the covenantor was merely a lessor and stockholder, the above summary of the evidence on this point indicates that Mr. Samuel D. Oliphant was much more than a mere stockholder and lessor. He appears to have been one of those who originally arranged for the starting of the new Bellmark pottery, and who, after it had begun business, has for several years participated in the active conduct of its affairs. I think he cannot be classed with Richard C. and Henry D. Oliphant, who had no connection with the Bellmark pottery, but should stand with Hughes, Robert N. and Sidney M. Oliphant as actively engaged in the management of its affairs, and with them should be held to respond to the covenant of July 6th, 1892, if it be found to be valid, and that their acts in the origination and conduct of the Bellmark Pottery Company were in breach of it.

Having ascertained which of the defendants were covenantors

and which have done the acts which are alleged to be in breach of the covenant, the next question arises, Were the acts of these defendants a breach of that covenant?

Hughes, Robert N. and Sidney M. Oliphant admit by their answer that they are devoting their time and energies to the performance of their duties as employes of the Bellmark Pottery Company. And the proof seems to me to be quite clear that the Bellmark Pottery Company, which these defendants are conducting, is engaged in producing pottery ware of substantially the same character as that manufactured at the Delaware pottery before they sold it to the complainants. They are shown by the testimony of Mr. Robert N. Oliphant to be engaged in making pottery ware and sanitary ware of the same shapes as were made at the Delaware pottery, and that they were selling these wares to some of the same people to whom they used to sell when running the Delaware pottery. Other witnesses testify that the Bellmark Pottery Company is producing sanitary pottery ware and also druggists' ware, and correspondence is produced which shows solicitations by the Bellmark company, addressed to customers who formerly bought such products from the Delaware pottery, to buy from the Bellmark.

It must be noticed that the complainant does not, in its bill, allege these solicitations by the defendants of their old customers who had traded with them when they owned the Delaware pottery to be inequitable acts which have a tendency to injure or destroy the good will of the Delaware pottery, which the complainant bought and paid for. Nor does the complainant seek to restrain such acts of interference with the good will of that business. The complainant comes into court with the defendants' covenant not to engage in the business of manufacturing pottery ware and asks the court to prohibit them from carrying on that business—in short, to compel the performance of that covenant. The facts showing interference with the good will are set up simply as evidences of the breach of the covenant, and the relief asked is that the defendants may be restrained from further breach—that is, from engaging directly or indirectly in the pottery business. The complainant stands solely on the covenant

and for its enforcement and not on its equity to have the thing which it had bought protected from the acts of the vendors in striving to recover it. This differentiates the case in hand from *Althen* v. *Vreeland, 36 Atl. Rep. 479,* where the bill was filed not only to enforce an express covenant which was held to be illegal because in restraint of trade, but also on the general equity of the complainant to have the thing which he had bought protected from the efforts of the vendors to get. it back again. These acts of the defendants in making the same goods and selling them to their old customers appear to put the defendants Samuel D. Oliphant, Hughes Oliphant, Robert N. Oliphant and Sidney M. Oliphant in direct competition for business in the manufacture of pottery ware with the complainant, the vendee of the Delaware pottery. This manufacture and these sales by the defendants are under the name of the Bellmark pottery. The defendants' covenant is that " they will not, nor will either of them, directly or indirectly, engage in the business of the manufacture of pottery ware except," &c. I do not think it matters in what capacity the parties (covenantors) engage in the business, whether as principals, individually, or as members of a partnership, or under employment of individuals or of a company, or as managers and active conductors of the business of making pottery ware by a corporation. Any and all of these undertakings must be held to be an "engaging in the business," &c., and must necessarily result in a breach of the covenant of July 6th, 1892, if that covenant be held valid.

The question remains to be considered, Was the covenant of July 6th, 1892, such a covenant as the courts may be asked to enforce, or was it, when made, one of that class which is in so far in restraint of trade that the courts, for that reason, should refuse to enforce it?

In the very earliest cases on this subject which have been considered by the courts, all contracts which were in any degree in restraint of the conduct of trade, were held to be void. The principle upon which these cases were decided was based upon the obvious truth, that it is against the interests of the public that a man should be permitted to bargain away his right to

earn his living and thereby possibly become a public charge, and might also deprive the community of the benefit which it should derive from the exercise of his energy and skill in the prosecution of his business. Covenants by which the covenantor bound himself not to engage in any business at any time in any place, if any such were ever made, would undoubtedly always have been void as in general restraint of trade whenever sought to be enforced. The question is almost always presented of a covenant seeking to restrain the covenantor from engaging in some particular business in which the covenantee is interested or which is sold to him, leaving the former at liberty to pursue any other business without restraint. In some of the very early cases in which the validity of such contracts was passed upon, these considerations of public policy influenced and controlled the courts to such an extent that covenants in restraint of trade, even if strictly limited as to the space within which the covenantor was excluded from prosecuting his business, were held to be invalid.

The case of *Mitchel* v. *Reynolds, 1 P. Wms. 181 (1711)*, arose on an assignment of the lease of a bake-house and a covenant not to engage in the business of a baker during the term of the lease, within a named limited district. The covenant was undoubtedly in restraint of trade, but the exclusion was only from a definite and limited area. The case was several times argued before the king's bench. In the opinion of Chief-Justice Parker (afterwards Lord Macclesfield), all the previous decisions are collated, and it was declared that the covenant, being for a valuable consideration and restraining only over a limited space and for a limited time, was to be held valid. This case has always been deemed to be the leading one in the exposition of the doctrine of the law on the subject of contracts in restraint of trade, and has never been in terms overruled, though there is much variance in the application of the doctrine there laid down and some modification of its principles.

In these cases the disadvantages to the public occasioned by contracts in restraint of trade were looked at principally from the point of view which considered the injury to be apprehended

from impediments which might be placed in the way of a member of society pursuing his lawful business, whereby he might be reduced to penury and become a public charge and the public at the same time lose the benefit of his productive labor, and contracts tending to lead to these consequences were held to be void. While all business was in a primitive condition and laws prohibited the practice of a trade without the previous service of an apprenticeship, and a man usually continued to follow during his whole life, in one place, the calling to which he was trained, and intercommunication between the different parts of the country was dilatory and difficult, it can well be understood that covenants which left the covenantor with no means of earning his living, a burden upon the public, and which deprived the community of the benefits of the practice of his trade, should be held to be against public policy and void. But as trade expanded and ease and speed of travel led to more diversified industries and to frequent changes from one business to another, it appeared to be a great convenience that one trader should be able to sell to another the business which he had built up, and in order that he might induce the proposed vendee to buy, it was necessary that he should be able to agree not to compete with the purchaser in the prosecution of the same business which he had sold. This freedom to sell a business and to covenant not to injure the thing sold by competition was found to be so advantageous to the public that it became a matter of public policy that every man should be at liberty to sell or exchange his business in the most advantageous manner and to preclude himself from interfering with his vendee in the enjoyment of the thing sold. The whole history of the law of covenants in restraint of trade is involved in the struggle for recognition and favor between these two principles—between the old rule, that contracts restraining the individual from the free conduct of business are disadvantageous to the public, and the later one, that freedom to dispose of a business, with a covenant not to compete with the vendee, is a necessity to all trade and advantageous to the public.

The general rule touching contracts in restraint of trade has

been broadly stated thus: Contracts in general restraint of trade—that is, restraining a man from pursuing his business anywhere—are deemed to be void as against public policy. Contracts in partial restraint of trade have generally been those which restrained from the pursuit of a business within a defined area, less than the whole country. In all cases where the restraint is partial as to its area, it may be lawful, and will be enforced if the exclusion is no wider than is reasonably required for the fair protection of the covenantee in the enjoyment of the business to which the covenant relates, and not so large as to interfere with the interests of the public. *Brewer* v. *Marshall, 4 C. E. Gr. 547; Mandeville* v. *Harman, 15 Stew. Eq. 189; Sternberg* v. *O'Brien, 3 Dick. Ch. Rep. 372; Ellerman* v. *Chicago Junction, 4 Dick. Ch. Rep. 256; Althen* v. *Vreeland, 36 Atl. Rep. 479.* So far as statements by the decisions of the courts can define the law, this has been declared to be the law of this state. So, also, contracts excluding from business with a limited class of persons, and those restraining from a trade within a certain space for a limited time, have been enforced by the courts, where the restraint is no wider than is necessary to secure to the covenantee the benefit of his covenant.

In ascertaining whether the exclusion is wider than is required for the protection of the covenantee, and therefore uselessly in restraint of trade, the courts have inquired into all the circumstances of the particular case (*Sternberg* v. *O'Brien, ubi supra*), and it has been held that in this respect no fixed rule can be laid down; each case must be determined as it arises upon the facts exhibited touching the business which is sought to be restrained, its nature, mode of conduct, place where and people with whom it is usually carried on. *Hitchcock* v. *Coker, 6 Ad. & E. 438.*

Upon this branch of the case in hand, the defendants base their criticism of the covenant of July 6th, 1892, now in question, upon three points—

*First.* They contend that this covenant is unreasonable in that it is much wider in the restraint which it imposes upon the covenantors than is in anyway necessary for the protection of the

covenantee in the enjoyment of the subject-matter of the sale to which the covenant relates. The defendants insist that the thing sold was a sanitary ware pottery manufacturing business, and while admitting that they could, by covenant, lawfully agree not to engage in manufacturing sanitary pottery ware, they say the covenant as expressed prohibits them from engaging in the manufacture of pottery ware generally, and is in this respect far broader in its restraining effect upon the defendants than is sufficient to protect the complainant in the pursuit of the sanitary pottery ware manufacture.

*Second.* The defendants insist that the covenant under consideration is, in fact, a restraint operating to exclude them from engaging in the business of manufacturing pottery ware anywhere in the United States; that the mention of the exception of the State of Nevada and the Territory of Arizona is colorable only and a mere pretence; that these places were selected for the exceptions because it was impossible to carry on such a business there, and with a design to evade the operation of the law which would declare a covenant in restraint of trade which was unlimited as to area of exclusion to be void as against public policy. They further contend that even if the exceptions named were made in good faith, yet the remaining area, from which the covenant was expressed to exclude the defendants, far exceeds the space within which it was necessary to protect the complainant from the interference of the defendants, and that such an exclusion is unreasonably in restraint of trade and the covenant is therefore void.

*Third.* The defendants claim that the covenant is wider as to the time during which they are excluded from engaging in pottery ware manufacture than the policy of the law will permit. They say the time of the expressed restraint, fifty years, though apparently limited, has been arranged so as in fact to cover the whole period of the lives of all the covenantors, and to be in effect as to them a perpetual exclusion from engaging in that business, and the covenant is therefore against public policy and void.

The first contention of the defendants is that the covenant is

unreasonable because the covenant is broader in its restraint as to the nature of the business from which the defendants are excluded than is necessary to protect the complainant in the pursuit of the business sold. It appears that the business sold consisted of a manufacturing plant at Trenton known as the Delaware pottery, located at Trenton, New Jersey, and conducted by the firm of Oliphant & Company. For a number of years prior to 1892, when the sale was made to the complainant, it had been engaged in the pottery business. The plant consisted of seven kilns, with all the appliances, apparatus and equipment necessary to the conduct of the pottery business. Immediately at the time of the sale the principal production of the Delaware pottery was sanitary ware, such as urinals, wash-basins, water-closets and also druggists' ware, consisting of mortars, pestles and articles of druggists' supplies and also, to a limited extent, crockery ware.

For the convenient definition of the articles produced in the pottery trade they are designated by the different uses to which they are applied. Articles such as urinals, water-closets, basins for sanitary wash-stands are termed sanitary ware; pestles, mortars and other vessels used in the druggists' trade are called druggists' ware; wash-tubs, kitchen sinks and the like are named laundry ware; pitchers, basins, bowls, plates, cups and saucers are termed crockery ware—all these articles, differing widely as to their use, have no essential variance as to their ingredients or methods of manufacture or character as a finished product, save in their shapes or in the uses made of them. They are all composed of a base of plastic clay to which their proper form is given by the manipulation of the potter, and they are then fixed in that form and glazed, by firing in a furnace. There is no greater variance between these several productions than there is in the products of an iron foundry. The kilns, appliances and equipment of the Delaware pottery had, before it was sold, been used to manufacture, not only sanitary ware, but druggists' ware and crockery ware, and had, without radical change, the inherent capacity to produce whatever pottery ware the conditions of the trade might at any time make profitable.

When the sale was made of this pottery, its plant and equipment to the complainant, it received by the conveyance a pottery, not limited to the manufacture of sanitary ware, but capable of manufacturing the other products of the pottery business, as that business is usually described either in the trade or in common parlance. The fact that at the time when the conveyance was made, the Delaware pottery was engaged largely in the production of sanitary ware, did not alter the fact that it had been and might be at the option of the owner used for the production of pottery ware of another character. The thing sold was a pottery—not only a sanitary pottery, but also a druggists' ware pottery and a crockery ware pottery, and with slight alterations of ingredients, tools and appliances (which are common in every manufacturing business), a laundry ware pottery. Such a plant and equipment might with entire propriety be designated as it was by the general character of its productions, the Delaware pottery, and not the Delaware sanitary pottery, by the special class of ware which it was then producing. Nor do I think the covenant can be deemed to be unreasonably wide because it restrains from engaging in the manufacture of pottery ware generally, while the object and aim of the purchase were to use the plant solely or principally for the production of sanitary ware. The intention of the purchaser and convenantee to use the plant purchased, to produce but one of the several classes of pottery which it could manufacture, does not make the covenant unreasonable because it restrains from competition in the manufacture of all the classes of articles which the plant could produce. It is not the intention with which the covenantee bought which supplies the test, but the relation of the covenant to the thing actually sold which furnishes the guide to ascertain the reasonableness of the restraint imposed by the covenant.

It is urged with much energy on the part of the defendants that the covenant, in order to be reasonable in excluding the defendants from pursuing a business, must go no further than to prohibit them from engaging in the manufacture of the particular kind of pottery ware which the defendants were making at the time of the sale, and that the covenant under considera-

tion which precludes them from engaging in the business of manufacturing pottery ware generally, is unreasonably wide, as it excludes the defendants from all the branches of the pottery business. It is insisted that the phrase " our pottery business" used in the original option letter of January 23d, 1891, is "just as specific, just as limited, just as close a definition as if they [the defendants] had said 'the *sanitary* pottery business which we are transacting,'" &c. I cannot give to these words so limited a meaning. They occur in the option letter of January 23d, 1891, proffering the sale of the defendants' business to Tapscott. The whole sentence is :

"We own good will, brands, patents, moulds, designs, horses, wagons, trucks, tools and all necessary implements used in our pottery business, and have the right to carry on a general business in the manufacture and sale of clay products."

The obvious intent of the offer is to tender a sale of the plant, equipment and business irrespective of the special articles produced at that time. Not one word in the whole letter mentions *sanitary* pottery, in any connection. In my view, a much more certain indication of the character of the business conveyed is that given by the answer of Oliphant & Company (of the same date as the option letter of January 23d, 1891) to Tapscott (*Exhibit A* of October 31st, 1895, for defendants) to his inquiry :

"*Q.* What kind of pottery do you manufacture?
"*A.* Plumbers' earthenware and sanitary specialties is our chief product ; also make drug ware and a small amount of crockery."

From these statements it appears that the business in which the Oliphants were engaged when the negotiations for sale were pending, and which they sold, and in respect to which they covenanted, was a pottery ware manufactory, practically as wide as the whole pottery trade, in the character of its products. Mr. Hughes Oliphant, one of the defendants, testifies that " the restraint contemplated was that none of the parties to those agreements were to enter into the pottery business."

The thing sold being a pottery, used and usable at the time of the sale in the business of the manufacture of pottery ware generally, the covenant entered into by the defendants was not to "engage in the business of the manufacture of pottery ware," &c. The covenantee was entitled to take a covenant which would protect him in the enjoyment of the thing conveyed. This was a pottery, manufacturing pottery ware of various kinds. The covenant is in its scope in this particular, as to the restraint from manufacturing pottery ware, simply coextensive with the business conveyed, and is not on this ground open to criticism because wider than is necessary to protect the complainant.

The second contention of the defendants is that the covenant in effect excludes them from pursuing their business anywhere in the whole country, and on any construction is wider as to the space from which it assumes to prohibit them from engaging in the business sold, than is reasonably necessary to protect the complainant in the enjoyment of that business.

The principle that covenants in general restraint of trade, by which a man is precluded from engaging in business anywhere in the whole country, will be held void has never been abandoned in this state, as is shown by the above-quoted decisions. But partial restraints from engaging in trade within a defined area, but leaving the covenantor outside of the prescribed territory still free to carry on his trade, may be lawful, and if lawful, will be enforced by the courts.

In considering the validity of these partial restraints—that is, restraints from trading in a limited territory—the courts held them to be lawful or not, accordingly as they were or were not in unreasonable restraint of trade. The court would consider the nature of the business or trade, the mode in which it was carried on, and the various circumstances which would enable it to determine whether the restriction imposed by the covenant, was wider than the protection of the covenantee in the enjoyment of the business sold, would reasonably require. If, upon this examination, the contract shut out the covenantor from no greater area than it was necessary he should be excluded from in order that the covenantee should fully enjoy the thing to

which the covenant related, it would be held valid; if, on the other hand, the covenant did exclude the covenantor from a greater territory than was necessary for the enjoyment of the covenantee, it would be held invalid. Until a very late period almost all the cases presented to the courts related to trades or business which extended over but a part of the country, and the accepted rule seems to have been that covenants restraining from engaging in a business anywhere in the kingdom, were in general restraint of trade, and void for that reason.

This view of the English law obtained from *Mitchel* v. *Reynolds*, in 1711, until the opinion of Vice-Chancellor James, in *Leather Cloth Co.* v. *Lorsont, L. R. 9 Eq. 345*, in 1869. The question arose on a covenant to keep a trade secret from disclosure or use anywhere in Europe, but the case was treated by Vice-Chancellor James as if controlled by the general principle, which he declares to be that there is to be no more restraint than is necessary for the protection of the purchaser, but intimates that this may, if necessary, be unlimited as to space.

*Rousillon* v. *Rousillon, 14 Ch. Div. 351*, followed in 1880, and still further extended the benefit of the new doctrine in favor of purchasers. That case arose upon a covenant entered into by a traveling agent employed by champagne merchants, who agreed with his employers not to represent any other champagne house for two years after he left them, and not to establish himself or associate himself with any other persons or houses in the trade, for ten years after he left them. The covenantor was employed in the business of the merchants not only all over England and Scotland, but also in some foreign parts. There was in the covenant no limit as to the extent of the area from which the covenantor was excluded, and it was admitted to be unlimited as to space. The learned judge, Lord-Justice Fry, held that the covenant was valid and should be enforced. The facts presented a novel question not only because the scope of the business in which the covenantor was engaged substantially covered the whole kingdom, but also because essential parts of the business were carried on in foreign parts. The opinion, which is very forceful, discusses the law regarding contracts in restraint

of trade and declares the rule to be that the protection of the covenantee is the only test of the reasonableness of the contract, and that this should be applied even where the area of exclusion covered the whole kingdom. The views expressed in Mr. Justice Fry's judgment have received support in *Badische Anilin, &c.*, v. *Schott, &c., Co., 3 Ch. Div. 447 (1892)*, which was also a covenant touching a business largely foreign. Lord-Justice Bowen, in the *Maxim-Nordenfeldt Case, 1 Ch. Div. 630 (1893)* (also involving a business extending over the kingdom and in foreign parts), has given a most luminous exposition of the law upon this subject. He disapproves of the statement of the doctrine in *Rousillon* v. *Rousillon*, and on a review of all the cases declares the rule to be that covenants which restrain from the conduct of a business anywhere in the whole kingdom are void, but partial or particular restraints—that is, those properly limited as to space of exclusion—may be valid if they do not impose any further restriction than is reasonably necessary for the protection of the covenantee. In the *Maxim-Nordenfeldt Case* the covenant, though restraining throughout the kingdom and practically during the life of the covenantor, was yet, as to the specifically-named business, deemed to be valid. Lord Bowen held that the nature of the contracts in both the *Maxim-Nordenfeldt Case* and in the previous *Rousillon Case* was an exception to the rule which governed English covenants in restraint of trade. These later opinions, holding that the covenant may lawfully protect the covenantee even if it exclude the covenantor from pursuing the business anywhere in the kingdom, have not been presented to our courts and seem to stand in opposition to the expositions of the law on this subject delivered in New Jersey decisions. They become valuable, however, only when the circumstances of the particular case under consideration make their reasoning applicable. This may be when the business to which the covenant relates is coextensive in its scope with the whole country, for all the English cases agree that if the business covers only a limited territory and the restriction of the covenant be wider than is reasonably necessary for the protection of the covenantee in the enjoyment of the business in that

territory, then the covenant is so far unnecessarily in restraint of trade as to be invalid.

In New Jersey the ancient English rule has been recognized and enforced by the court of errors and appeals in *Brewer* v. *Marshall, ubi supra.* In that case the vendor of a marl-bed agreed not to sell any marl by the rood or quantity from his premises "adjoining the above property," referring to the marl-beds sold. An injunction had been allowed to enforce this covenant by restraining the alienee of the covenantor, and an appeal was taken from a decree dissolving this injunction. In the opinion of the court of errors the case of *Mitchel* v. *Reynolds* is referred to as stating the rule that all general restraints are illegal, and *Homer* v. *Ashford, 3 Bing. 326,* is quoted as expository of the reason of it in these words : "The law will not permit anyone to restrain a person from doing what his own interests and the public welfare require that he should do. Any deed, therefore, by which a person binds himself not to employ his talents, his industry or his capital, in any useful undertaking in the kingdom, would be void." The court of errors then states : "And so far has this principle been carried that, even in cases in which the restraint sought to be imposed is only partial, it has been repeatedly held that such an agreement would be void unless it be reasonable, and that no such agreement can be reasonable in which the restraint imposed on the one party is larger than is necessary for the protection of the other." Citing *Horner* v. *Graves, 7 Bing. 743.* It will be noticed that this opinion recognizes the force of the old rule to make void any covenant of restraint excluding from a business without limit of space, and applies the test of reasonableness of the restraint only in case it is partial—that is, excluding from a limited territory. That this view has been accepted in our state is also shown by the expression used by Vice-Chancellor Van Fleet in *Harman* v. *Mandeville, ubi supra:* "The rule is, not that a limited restraint is good, but that it may be good. It is valid when the restraint is reasonable, and the restraint is reasonable when it imposes no shackle upon the one party which is not beneficial to the other."

Proceeding to consider the covenant in question in regard to its reasonableness—as to the extent of the space from which it excludes the defendants—I will first examine the covenant itself in the light of the evidence. The covenantors agree that they will not nor will either of them "engage in the business of the manufacture of pottery ware * * * within any state in the United States of America, or in the District of Columbia, except in the State of Nevada and the Territory of Arizona," &c.

The defendants contend that this restriction is unreasonable because it extends, in fact, over the whole United States; that the mention of the two excepted places is a sham, inserted, not to leave a space within which the covenantors might pursue their business and the public receive the benefit of their labors, but simply to appear to do so, and thus avoid the condemnation of the law, which, had the covenant frankly expressed its operative effect and in terms excluded the covenantors from the whole United States, would have declared the covenant void as in general restraint of trade.

There is some evidence as to the manner and purpose of inserting these exceptions. Richard C. Oliphant testified that Mr. Tapscott, who was the party of the second part in the covenant, said, touching these exceptions of Nevada and Arizona, "that pottery ware could not be made there, and it would avoid the legal objection to the monopoly." Mr. Tapscott denies this. He testifies that he did not know where pottery ware could be made. He states that the form of the covenant was that which had been previously used by the New York Biscuit Company and Diamond Match Company consolidations, and that Nevada and Arizona were supposed to be distant from Trenton, and that they were chosen for the exceptions because they were "away from the territory in which they [the defendants] had sold their good will." Mr. Bayne, the president of the complainant company, though he was not proven to have made any such statement, denies that he did make it. But Bayne declares that the exceptions were "put there to comply with the law, to make assurance doubly sure on that point;" that the lawyers who drew the papers selected the territory, and that he and his asso-

ciates would have given the defendants any other space so long as they went far enough away. The statements of the complainant's own witnesses show that the exceptions were not made because of any purpose to save to the defendants an area anywhere in the whole country within which the public might have the benefit of their business. Nor is there any . proof or pretence that within these excepted areas the covenantors ever had done, or hoped to do or could do, the business referred to. The admitted objects of the covenantees in their selection were to avoid the disfavor of the law, and to force the covenantors as far away as possible. The evidence of Captain Dahlgren, who is familiar with Nevada and Arizona, named as the areas excepted from the covenant, is full and without contradiction. He testifies that there are none of the essential requisites for pottery manufacturing in those localities. Neither clay, coal nor other fuel, water, labor nor even population, such as is required in the manufacture of pottery ware, can be obtained in either place. The interests of the public in retaining somewhere the benefits of the ability of the covenantors in the pursuit of their business, would have been just as well secured, and the purposes of the covenantees no more effectually served, had the area of exception been named as "except within the borders of Lake Michigan and Great Salt Lake," for on the proofs the pursuit of the pottery business is no more impossible in these lakes than in Nevada and Arizona.

I think the weight of the testimony indicates that these localities were chosen for the exception simply to appear to avoid the operation of the law which makes the covenant invalid if general as to space, and at the same time actually to prohibit the, defendants from competing with the complainant anywhere in the United States. This is to observe the law to the eye, but to break it in the fact. The rule which permits the contract, though in restraint of trade, to be considered valid, when somewhere within the whole country there is left some space within which the covenantor may give the public the benefit of his ser- . vices, is, in view of the testimony, shown to have been evaded

by such exceptions, and the contract should be considered as if·
the exceptions were not inserted.

I am referred to the decision of the New York court of
appeals in the case of *Diamond Match Co.* v. *Roeber, 106
N. Y. 485,* in which the court says as to a like exception:
"We are unwilling to say that the doctrine as to what is a gen-
eral restraint of trade depends upon state lines; we cannot say
that the exception of Nevada and Montana was colorable
merely." But the opinion in that case does not show that there
was any evidence at all upon the point of the sham character of
the exceptions; from its language I am led to believe that there
was no proof showing the exceptions to have been made in bad
faith, and wholly regardless of saving to the public the benefit
of the covenantors' labors somewhere in the whole United States,
and that the court was asked to assume this condition of im-
possible pursuit of the business within the excepted area, to
exist, without any evidence whatever to show its impossibility.
I agree with the learned judge who delivered that opinion, that
in the generality of cases where such covenants relate to a manu-
facturing business, the ultimate space from which the exclusion
must not be absolute, should, in this country, be the whole
United States, in view of the constitutional powers of the general
government to regulate commerce among the several states, and
securing the absolute freedom of trade, and the privilege of
universal and unrestrained migration to the inhabitants of the
different states. See, also, *Althen* v. *Vreeland.* But I do not
accept as forceful in this state, his statement that the doctrine
declaring void contracts in restraint of trade which are general
as to the territory of exclusion, is an arbitrary rule, which may
be avoided by an equally arbitrary exception. This view was first
hinted at by Vice-Chancellor Wickens, in *Allsop* v. *Wheatcroft,*
*15 Eq. 64,* when he stated that Vice-Chancellor James had in
*Leather Cloth Co.* v. *Lorsont, ubi supra,* thrown "some doubt on
the existence of a hard and fast rule which makes a covenant in
restraint of trade invalid if unlimited in area." In the *Rousillon
Case,* Lord-Justice Fry refers to this definition and says: "Such
a rule might always be evaded by a single exception. No excep-

tion can be said to be colorable to a rule of this description, because you can only judge whether an exception be colorable or not by the principle of the rule, and if the rule be really an artificial one, without principle, there is no criterion for saying whether the evasion is colorable or not."

This rule, in its origin, was declared to be based upon the principle that it was disadvantageous to the public welfare that a man should be permitted to bind himself by contract not to engage in business whereby he might earn his living, and thus be in danger of becoming a public charge, and of depriving the public of the benefit of the exercise of his skill and industry. The suggestion of Lord-Justice Fry that the rule is an arbitrary one, based upon no declared principle, and that exceptions to it may also be arbitrary and without reason, has no support in the long line of English cases which have applied the rule and expounded the principle on which it is founded. In this state the same course has been followed, and the same reasons have been restated for the enforcement of the rule. *Brewer* v. *Marshall, 4 C. E. Gr. 547; Mandeville* v. *Harman, 15 Stew. Eq. 189; Sternberg* v. *O'Brien, 3 Dick. Ch. Rep. 372.*

Where the scope of the business restrained does not extend throughout the whole country, the question of the arbitrary character of the rule is not raised. Even where the expanse of the business is coextensive with the whole country, it remains a question whether it is not the truer policy to hold the general covenant which restrains from following the business anywhere to be void, and thus save to the public the value of the skill and energy of the covenantor in pursuing his business, than to enforce it for the benefit of the covenantee in aid of the freedom of contract. The tendency of the modern English cases is, however, to support the latter view, but it has only been expressed in cases where the scope of the business under consideration was, in fact, coextensive with the whole kingdom.

The complainant insists that even if the exceptions of Nevada and Arizona are merely colorable, still the words of the covenant "within any state of the United States, or within the District of Columbia, except the State of Nevada and the Territory

of Arizona," must be construed to mean not the whole United States, but each separate state—in short, that the covenant as to the space of exclusion is divisible, and must be enforced in any one state in which it might be reasonable to enforce it, even if it would be unreasonable to enforce it in every other state.

In a large number of English cases this distinction is accepted, and covenants naming two or more separate areas of exclusion have been enforced as to one, though the covenant was, as to other space named, unreasonable in its restraint of the covenantor. In these cases the divisible areas are separate and distinct places, such as several different cities, and the contract on its face as expressed by the parties themselves, specifically names them. The same principle has been recognized and enforced in New Jersey, where there are several distinct stipulations in a contract, some of which are illegal and others legal, and our courts have enforced the valid stipulations. *Stewart* v. *Lehigh Valley Railroad Co.*, *9 Vr. 520 ; Erie Railroad Co.* v. *Union Locomotive, &c., Co.*, *8 Vr. 23.* In all these cases the several character of the valid stipulations as distinct from the invalid ones, is apparent in the contract as expressed by the parties themselves, so that the court is not called upon to give construction to ambiguous phrasing, and perhaps impose upon the contractors a stipulation to which they would not have agreed.

In the case in hand, the space referred to (considering the exceptions to be pretentious as above stated) is one contiguous area, constituting as an entirety the whole United States, which is of itself a unit; the exclusion from business within any state of the whole United States is necessarily exclusion in all of the United States, as the sum of all the parts must constitute the whole. The reference to the territory of Arizona as an exception shows that all the other territories were deemed to be included within the reference to the United States. The parties, by their covenant made by one side and accepted by the other, made this agreement as to the whole United States, and I do not think the court should, when disputes between them have arisen, thrust the element of divisibility into the contract when the parties themselves did not put it there. There appears on

Trenton Potteries Co. *v.* Oliphant.

the face of the covenant in the statement of the area of exclusion, when read in the light of the evidence, a clear purpose to prohibit the covenantors from the following of their business anywhere in the United States, and this court should be no readier to find the element of divisibility in the covenant than was the English court of common pleas in *Horner* v. *Graves, 7 Bing. 735,* where the covenant restrained from practicing dentistry within one hundred miles of the town of York and was held void because the area of exclusion was unreasonable. This area was contiguous and might have been considered divisible into each mile of the one hundred miles around York, in the same sense as the covenant under consideration is divisible into the several states of the United States. Though the case was thoroughly argued, such a point does not seem to have occurred to either the counsel or the court.

In *Althen* v. *Vreeland, ubi supra,* there was a covenant not to engage in a business similar to that sold, within one thousand miles of Newark, New Jersey, the place in which the business was located, and Vice-Chancellor Emery refused to select out of the one thousand miles radius the State of New Jersey, because a restriction to the extent of that state would be reasonable.

I understand the rule upon this question of divisibility to be that the court will take the covenant as the parties made it. If it is expressed to exclude from several separate and distinct places, as to some of which the exclusion is reasonable while as to others it is not, the court will consider the covenant divisible, and enforce it within the reasonable area. In my judgment, the court should not select from a contiguous area which is in itself unreasonable, such a place within that area as would, if it had been distinctly named, have been deemed to be a reasonable extent of exclusion, declare the covenant divisible, and enforce it in the selected space.

I have heretofore considered the objection to the covenant in question with relation to its validity when its operation excludes the covenantors from engaging in their business anywhere in the United States. Under the law as laid down by the courts

46

of this state, such a covenant is in general restraint of trade, and, for this reason, void.

But considering the covenant touching the area of exclusion, in the light of the evidence, from the narrower point of view of its reasonableness as a protection to the covenantee in the enjoyment of the subject-matter of the sale, I am brought to the same conclusion.

The business sold consisted, at the time of the sale, of a pottery producing sanitary ware, plumbers' ware, druggists' supplies and crockery ware—in short, a general line of goods in that trade. The covenantors had been carrying on this business for a number of years (Richard C. Oliphant testifies that for twelve years he had the oversight of it), their factory being located at Trenton, New Jersey, where all their product was made. The business, as to its manufacturing element, was necessarily local. The area of territory over which the product of their factory was disposed of at the time when the business was sold, is shown by the undisputed proofs to have been within a limit substantially defined by the Mississippi on the west, with some business in Washington and Richmond and Louisville, but none south of those points. It thus appears that the Delaware pottery consisted of a business whose manufactory was located at Trenton, and whose sales were practically limited to the Eastern, Middle and nearer Western States, and not extending over the states west of the Mississippi, those of the Pacific slope or those of the South, except parts of Virginia and Kentucky. This factory and business constituted the subject-matter of the sale, and it was in respect to this that the parties covenanted. If the covenant was good because not too wide to protect the covenantee, it was good the day it was made, as applicable to the business as it then existed; if it was bad because imposing upon the covenantors a wider exclusion than the covenantee fairly needed to enable him to enjoy the thing sold, it was bad when made, because it then hampered the covenantors to a degree not necessary to protect the covenantee. The covenant, if void when made, could not become valid because of any subsequent happening. The reasonableness of the covenant (and

therefore its validity) must be tested by ascertaining whether in its terms it was, when it was made, wider than was necessary to protect the covenantee in the enjoyment of the thing sold.

While it is true that no rigid limit can be declared within which the restraint would be reasonable and outside of which it would be unnecessary, yet there may be a restraint so wide in its area of exclusion as to leave no question open that it is excessive. Looking at this covenant as made, and without criticism of the exceptions, it excluded the covenantors from pursuing the business not only within the area within which it was conducted when sold, but also from the whole United States except the two places, Nevada and Arizona. All that was needed to protect the covenantee in the enjoyment of the thing sold was to exclude the covenantors from competing with the purchaser within the area where the business was done, but in fact the exclusion as expressed would shut out the covenantors from the pursuit of the business over whole groups of states where the Delaware pottery had never done any business, and where, therefore, there could be no competition with the purchaser in carrying on the business bought. This space from which the covenant thus unnecessarily excludes the covenantors far exceeds in area the territory within which the business was done which was to be protected by the covenant, considering this territory with the utmost liberality with relation to the widest area that either vendor or vendee of the business sold could reasonably have contemplated as the area of the business and the covenantors' exclusion from competition. In stating this view I consider, however, only the territory within which the Delaware pottery had done business at and before the time of the sale, and not the territory over which the complainant (which is an aggregation of the Delaware and several other potteries) afterwards extended its business.

The complainant, however, insists that the reasonableness of the covenant is to be tested by considering as the territorial extent of the business to be protected by the covenant not that area within which its business was done by the Delaware pottery at the time of the sale, but the much greater area within which

business was done by the complainant, the Trenton Potteries Company, at the time when the bill in this cause was filed. The complainant argues that there is no rule by which the covenantor should be " limited to the exact location of the business at the time of the sale. Every man who goes into business expects to extend his operations, and here the thing that we were entitled to have under the covenant was that we would not be met with the competition of these sellers in the use of the thing sold to us—the natural, ordinary, accepted use." The proof shows in point of fact that since the sale took place the Trenton Potteries Company (the aggregation of the five potteries) has so extended its sales as to make a market of the entire United States and Canada, and the complainant claims that it is no more than reasonable, for their proper protection, that the covenantors should be precluded from competing with it in prosecuting its business of the whole five potteries anywhere within the United States.

I understand the rule to be that when a covenant is given against competition with an existing business, the area of exclusion from competition, in its relation to the territorial extent of the business, is what the courts regard in testing the reasonableness of the covenant. This was the course observed in *Horner* v. *Graves, ubi supra; Ward* v. *Byrne, 5 Mees. & W. 555 et seq.; Mallan* v. *May, 11 Mees. & W. 666; Allsop* v. *Wheatcroft, L. R. 15 Eq. 59,* and other cases. In *Ellerman* v. *Chicago Junction Co., 4 Dick. Ch. Rep. 256,* it was expressly declared that the validity of the restrictions is to be governed by their reasonableness at the time of making the contract. So, in *Cook* v. *Johnson, 47 Conn. 175,* it was held that a covenant in restraint of trade, which was reasonable when made, could not be affected in its operation by subsequent circumstances. The same doctrine was declared in *Rannie* v. *Irvine, 7 Man. & G. 976.*

Vice-Chancellor Emery, in *Althen* v. *Vreeland,* tested the reasonableness of the covenant by the relation of the restriction to the extent of the territory over which the business was done at the time of the sale. I think this view accords with correct principles. It is the business as it existed in the area over which

it fairly extends at the time of the sale that the vendors convey and in respect to which they covenant. If the possibility of unlimited subsequent expansion were to be considered as a justification for a covenant unlimited as to space, then every covenant attending a conveyance of a manufacturing business making sales of its products, must be supported if the business has, at the time it is sought to be enforced, grown to be as wide as the covenant. And this will be true no matter how limited the extent of the business may have been at the time of the sale, or how extended it may have become afterwards. The covenantors may thus be shut out from the pursuit of the business anywhere by circumstances in which they have no part and regarding which they did not contract.

Suppose one of the biscuit bakeries which now compose the New York Biscuit Company baked its biscuits and sold them before and at the time the combination was formed, wholly in New York City. Its owners might lawfully have covenanted not to carry on a like business in New York City, where their business was done at the time of the sale, because there would remain to them the rest of the country in which they could still carry on their trade and give the public the benefit of their labors, and the covenantee would be protected in the enjoyment of what he purchased. But suppose the owners of one of these biscuit bakeries on selling to the company had covenanted not to engage in the business anywhere in the United States except in Maine and New Hampshire, could such a covenant be held to afford no more than a reasonable protection to a covenantee who bought a business limited only to New York City? And is it any answer to say that the area which must be considered in testing the reasonableness of the covenant, is not the protection of what the biscuit company bought from the covenantors, but the added extent which the business had acquired by the aggregation of purchases from a number of other parties?

The extent of the territory over which the business of the Delaware pottery was carried on at the time of the sale had been defined by the previous experience of the vendors to be limited to an area east of the Mississippi and north of Washing-

ton, Richmond and Louisville. So far as the evidence shows, the business sold had not, at the time of the sale, any inherent capacity for further extension over the whole territory of the United States. It had been carried on for many years, and its utmost limits were those above indicated. What is sought by the present suit, is to expand the covenant, given to protect the purchaser of the Delaware pottery from competition by the vendors in the business done by that pottery, into a covenant to protect the vendee of that one and four other potteries, in the business which it had purchased from them all. The greatly-wider scope of the business of the complainant which now exists has come by reason of the additional elements of increased capital, combination with other associates in trade and control of production, price-making, distribution and sales incidental to this association of the several other potteries. These advantages did not attend the business of the Delaware pottery as it was sold, and in respect to these the defendants did not covenant or receive any consideration, and there cannot be imputed to them an engagement to protect the complainants in the enjoyment of these benefits which came from other sources than the covenantors. Nor can the community, by this strained application of the rule protecting the covenantee, be deprived of the services of the covenantors in localities outside of the scope of the business they sold. This would be forcing a test of the validity of the covenant by its reasonableness as a protection not only of the thing sold, but also of the subject-matter of four other sales, by other parties than the covenantors, and a protection also of an increase and expansion resulting from this aggregation and several years' prosecution of its business.

It is plain that the covenant, even accepting the exceptions as genuine and made in good faith, was far wider in the area of its exclusion of the covenantors from the pursuit of their business, than was in any way necessary to protect the covenantee in the enjoyment of the thing sold. Such an exclusion was an un-reasonable deprivation of the right of the community to have the benefit of the skill and industry of the defendants in the

pursuit of their business, and makes the covenant void as against public policy.

The case of *Alpaugh* v. *Wood, 24 Vr. 638,* is referred to by the complainant as laying down a criterion for ascertaining what is a true reasonableness in the interpretation of the contract. In that case the defendants had contracted to " take the entire charge of the manufacturing department of a pottery, including the decorating department," and to give their time and skill to the management of the business. The suit was brought because of alleged failure to exercise the proper skill and care in performing the contract. It was shown that at and before the contract the factory had produced only common grades of ware ; that soon after the defendants took charge they sought to make higher grades of goods and to decorate them. In this they spoiled the goods. At the close of the plaintiff's case he was nonsuited, on the ground that the contract related only to the common grades, which had been manufactured prior to and at the time of the contract. On error the judgment was reversed. The court of errors declared it was reasonable to assume that in making an arrangement to last over three years for the superintendent of an enterprise the parties contemplated the introduction of improvements, &c. ; that the opposite assumption would be unreasonable. It is insisted the court of errors has thus established a measure of reasonableness whereby the covenant in the case now under consideration must be held to be only reasonable, if it be tested by the protection which the covenantee may need in the enjoyment not only of that which the covenantors sold, but of what the covenantee bought of other parties, because every man who goes into business may be expected to extend his operations, &c.

The case cited does not aid the determination of that now under consideration. The terms of the contract expressly provided for the taking charge of a decorating department, and the defendants having in recognition of that obligation undertaken its performance and failed, and suit being brought because of their failure, it was quite within their contract to hold that the defendants reasonably contemplated the introduction of such

improvements in making decorative ware and its incidents, as were then or might thereafter be in common use in similar establishments. In the case in hand the covenant must be held to have related to the thing sold, and nothing in it indicates any consideration by the defendants for the protection of anything else than the Delaware pottery business which they sold.

Mr. Tapscott, who secured the contracts for the complainant, obviously had at an early period in the transactions a clear conception of the advantages of a covenant which might restrict the vendors not only from competing with the business which they sold, but also from engaging in business in competition with the other potteries which Tapscott was then in the act of buying. The covenant against competition, in the option taken January 23d, 1891, from the Crescent Pottery Company, one of the five in the combination now known as the Trenton Potteries Company, the complainant, prohibited the manufacture of pottery ware " now made by the five potteries of which this is one." It will be perceived that at the very opening stage of the transactions, in January, 1891, this contract with the Crescent company attempted to secure to the covenantee by express agreement, the same liberality of protection which it is now argued must be imputed as a reasonable construction to the defendants' covenant which makes no mention of this greater exclusion ; for the defendants, in selling the Delaware pottery, never referred to the productions of the other potteries in the proposed combination. In my judgment, if they had, in consideration of their sale of their own Delaware pottery, in express terms covenanted not to compete with the vendee in the business done by the five potteries of which the Delaware was one, the covenant would not have been enforceable, because not necessary to protect the vendee in the enjoyment of the Delaware pottery, the thing which the vendors sold.

The third ground on which the defendants resist the enforcement of this covenant is, that it is so wide in point of time as to exclude them in fact from engaging in business during the whole period of their lives, which, in effect, is a perpetual exclusion and is unreasonable and against public policy, &c.

On this question of the reasonableness of the durations of a restraint it has been held, in England, as to some covenants, that if they are in other respects unobjectionable the mere fact that they restrain the defendant during his life, is not so unreasonable a duration that the covenant will be held void. This has been so held as to a druggist clerk's covenant with his employer not to engage in that business in a certain town. *Hitchcock* v. *Coker, 6 Ad. & E. 453 ; Hastings* v. *Whitley, 2 Welsby, H. & G. 611.* In *Elves* v. *Croft, 10 C. B. 241,* a butcher's agreement with his vendee of the lease of the shop, not to carry on the trade, was held good, even after the expiration of the term and after the covenantee ceased to carry on the business. So a surgeon with his partner. *Atkyns* v. *Kinnier, 4 Welsby, H. & G. 776.* In this state, however, an injunction was refused in *Mandeville* v. *Harman, 15 Stew. Eq. 185,* on a contract by an assistant to a physician not to engage in practice of medicine in Newark " at any time hereafter," on the ground that the good will of a physician's practice was dependent upon the personal skill of the physician and would die with him ; that, however the law might be in England, in New Jersey a property right in such a good will had never been recognized.

This question of the unreasonableness of a covenant on the element of its duration, becomes of no significance when it is held, as in this case, to be objectionable because in general restraint of trade —as to the area from which it excludes the covenantor. The same result attends a finding that the covenant, though in partial restraint of trade, is wider in the space of exclusion than is reasonably necessary to protect the covenantee. For each of these reasons the covenant under consideration is against public policy and void. A limitation in point of time in such a covenant, however reasonable in itself, cannot save it from the objection that it is against public policy.

The principle is very tersely stated in a note to *Hunlocke* v. *Blacklowe, 2 Saund. 156 b :* " The principle on which contracts in restraint of trade, partial in point of space, have been supported has not been applied to restraints general in point of space, but partial in point of time ; for that which the law does

not allow is not to be tolerated because it is to last for a short time only."

The prohibition which prevents the covenantor from practicing his trade anywhere, deprives the public of his services entirely during that period. The partial restrictions which are supported are those which leave a portion of the public to receive the services of the covenantor, but where the contract is for a general restraint, though for a limited time, the whole of the public is deprived of his services during the period in question. So, when the exclusion reaches over an area not necessary for the enjoyment by the covenantee of the thing sold, the public is to this extent uselessly deprived of the benefit of the covenantor's skill and labor, and this the law does not tolerate even for a short time. The limitation of time in this covenant is therefore of no aid to the complainants.

I have found the covenant to be void because of its too extended area of exclusion. I do not deem it necessary to consider its reasonableness upon the point of its duration.

The defendants raise a further point of objection to the granting of an injunction to enforce this covenant, upon the ground that the scheme which has combined these five potteries under one management, as the Trenton Potteries Company, contemplated for its principal object the control of the production, distribution and sale of sanitary pottery ware, admitted in the complainant's prospectus to be a necessity of life. That the covenant now sought to be enforced was taken as one of like character with four others, obtained at the same time in aid of the common object, to preclude competition in the production of sanitary ware. The covenants affected three-fourths of the production of sanitary ware in the whole country, and secured to the complainant company a dominance in the trade, which, if the covenants of restraint were enforced, would have enabled them substantially to monopolize the production and sale of one of the necessities of life.

The evidence shows that at the time the negotiations opened for the purchase of the potteries now forming the complainant company, those potteries, and others which were engaged in the

production of sanitary ware, were members of an association which was called the American Sanitary Potters' Association. This association controlled the prices at which these goods were put upon the market.

Mr. Hancock, who received the conveyance of the Delaware pottery real estate, as trustee to convey it to the complainant company, and is its vice president, testifies that there were eight members of that association in July, 1892, when the complainant secured the combination of five of them. In determining the action of the association, each pottery in the association had one vote, and the vote of the majority controlled the action of the whole. He further states that on acquiring control of five of the eight members of the association, the combined company preserved the individuality of each of the potteries which it bought, so that the combination, the Trenton Potteries Company, had five votes in the association, instead of one. Mr. Tapscott, in promoting the combination, sought to bring in all of the members, but failing in that he secured the five, forming a majority of the association. He was very anxious to secure those potteries which produced much sanitary ware, and indifferent to those which made but little. His action in forming the combination began when he had made a certainty that he could secure a majority of the members of the Sanitary Ware Association, and each step in completing the combination was taken simultaneously with the whole five potteries. The covenant sought to be enforced in this case, though separate and independent in itself, and applicable only to the Delaware pottery, and framed to preclude the defendants from engaging in the business, was accompanied by other covenants imposing a like restraint upon the vendors of each of the other four sanitary potteries. The slight variances in these covenants indicate the plan. That taken from the "Crescent" precludes production of pottery ware "now made by the five potteries of which this is one." That taken from the "Equitable" prohibited the vendors from engaging in the manufacture of sanitary ware.

The formation of a company controlling as nearly as possible the whole sanitary ware production was evidently within the

contemplation of the parties, and was carried into effect by the steps above recited. The sets of questions asked, and the successive and simultaneous agreements, and the explanatory testimony, clearly show this. The circular inviting stock subscriptions also shows it, and indicates that the possession of this control of sanitary ware production, and the power to exclude almost all of the previous makers from the trade, were esteemed by those offering the stock of the combined company for sale, to be a most important quality in appreciating the value of that stock. They announced that the five companies manufactured and sold seventy-five per cent. of the entire output of the sanitary plumbing ware made in this country, that these goods were " of absolute necessity to the community," and that those who went out of the business did so under contract not to engage in any competing business.

That the scheme contemplated the control of the sanitary ware production, is further shown by the incident of the subsequent purchase of the stock of the Brewer Pottery Company. This company was producing sanitary ware. Mr. Bayne states that the proposition to purchase its stock was not favorably considered until he was impressed by the fact that " it was necessary for the protection of our interest in the East to have some stock in the West." Others of the owners of the stock in the Trenton Potteries Company joined Mr. Bayne in purchasing a bare majority of the stock of this outside sanitary ware pottery. The Trenton gentlemen who thus joined in this purchase had all of them covenanted not to engage in the pottery business, but Mr. Bayne explains that "the action was taken for the protection of the Trenton Potteries Company." Mr. Hancock also explains that this purchase was made to protect the prices then prevailing in the combination, referring to the Sanitary Potters' Association. Two hundred and fifty thousand dollars was spent for this purpose. Although the ownership of this stock was in the individuals who made the purchase, the whole of the stock bought was put in the name of Mr. Morse, of the banking firm of A. M. Kidder & Company, who were financing the Trenton potteries, with absolute authority to con-

trol the concern, for the protection of the interests of the associated potters of the Trenton Potteries Company. The final effect of this purchase was, that the Trenton Potteries Company and its financial supporters, were enabled to dictate the production and prices of much the greater part of the sanitary ware then made in this country. This control was at that time not only over the production and prices of the sanitary ware made in the potteries which the complainant had acquired and combined in the Trenton Potteries Company, but at the time the combination was made, the complainant had contrived and was able, under the arrangement retaining its five votes of the eight in the American Sanitary Potters' Association, by its majority vote, to control the prices of the sanitary ware produced by the other members of that association whose potteries it had not purchased. All that was needed to perfect its dominion over that trade was the enforcement of the covenants securing the combination against competition from those whose potteries it had bought, and it was well fortified to maintain its power to dictate the terms upon which the community would be permitted to obtain what the controllers of its production declared was "an absolute necessity."

The complainant insists that in the acquirement by the complainant of the five potteries "the purchases were distinct and separate; they were made in pursuance of no combination or executory contract," and that the question is therefore presented whether a "purchase of several out of a great number of plants engaged in one industry, is objectionable to the law."

These contentions are in this phase of the case to be considered from the point of view which the protection of the interests of the public, may require the court to take. So far as the purchases of the five potteries were concerned in their relation to each other, they were, indeed, distinct, but their association was much more than a simple aggregation of separate purchases each executed and complete in itself. Looking at the transactions in their broader relations to the interests of the public, the testimony shows a scheme, single and complete in itself, based upon an expectation of obtaining by a combination of the five sani-

tary ware potteries, and the acquiring of their majority power in the Sanitary Potters' Association, and the enforcement of the covenants against competition, the control of the production and price of an article of merchandise which had become an article of necessity in public use. The steps towards perfecting this plan were stopped or retarded by every interference with the furtherance of this design, and went on to completion only when this object appeared to have been certainly attained. All of these incidents—the purchase of the five potteries, the control of the American Sanitary Potters' Association, and the exclusion of the vendors of the five potteries from competition—were component parts of the scheme whereby the control of the marketing of sanitary pottery ware was to be secured. And this, too, not as a means of successful competition with rivals in the trade, but to enable the complainant to dictate to the public, the prices which must be paid.

It is contended with much ingenuity by the complainant, that there cannot be a monopoly where there is a mere succession or aggregation of purchases; that this result always attends every acquirement of property by which one buys the stock and business of another engaged in the same trade; that the party making such purchases has the right to fix the production and the prices of his own goods as he pleases, after as much as before the acquirement of his competitor's business.

The complainant, however, did not stop at this point, either in the design or in the execution of the scheme which resulted in its formation. By securing the voting power of the five potteries in the potters' association, it sought, and, for a time at least, secured the means of imposing the acceptance of the prices which it fixed, not only on the sales of sanitary ware which the five potteries produced, but also on the sanitary ware produced by the potteries of the other three members of that association, which the complainant had not purchased. Here was a control obtained and exercised by the complainant over the production and prices of sanitary ware manufactured by separate and independent owners, enabling the complainant to raise the prices of this merchandise as its interests might suggest. This condition

of things existed for nearly if not quite a year after the complainant company was formed. It is impossible to read the frank testimony of Mr. Hancock, the vice president of the complainant company, without accepting the conclusion that the large expenditure of $250,000 by those interested in the complainant company, in securing the control of the Brewer Sanitary Ware Pottery, at Tiffin, Ohio, was made to preserve the power over prices which it was believed had been already secured, but which the Brewer company threatened to destroy. Speaking of the relations of the Brewer company and the complainant, after this purchase of Brewer company's stock, he says, the purchase of the majority of the stock of the Brewer company was made at the suggestion of Mr. Tapscott, Mr. Bayne and the New York parties; that it was bought for $250,000 by Mr. Hancock and others, and put under the absolute control of Mr. Morse, of the banking firm, without any definition of the character of his holding, the owners trusting to luck, but having confidence the bankers would carry out the design of the buyers, which was that this pottery should be kept under control of the purchasers, who were the directors and managers of the Trenton Potteries Company. Mr. Hancock says they made this purchase to protect the prices then prevailing in the combination of which the Brewer company was not a member, and thus to protect the money-making power of the complainant company, which controlled the combination. It is not surprising that the expected result followed, and that Mr. Hancock should testify regarding the complainant company and the Brewer company, " their prices are similar now in the open market." The purchase of the Brewer pottery is a clear indication of the original object—the control of the market.

It is of no significance that some time after complainant had secured this position from which it could dictate prices to the public, the Sanitary Ware Potters' Association was broken up, and the scheme in this particular failed. The validity or invalidity of the contract did not depend upon the success or failure of the plan to secure a monopoly of the market. If it was against public policy when it was entered upon, it was tainted

and non-enforceable in the courts ever after. Even if the scheme were beneficial in its results, it would not be validated. Where a combination which is against public policy, which has obtained control of prices, has in fact reduced them, it is yet invalid, for the reduction may be necessary to crush competition and the combination still retain power to raise them at its discretion. *Richardson* v. *Buhl, 77 Mich. 660.* Nor is it any avoidance that it improved the quality of the goods. *State* v. *Standard Oil Co., 49 Ohio St. 137.* Nor that the titles to all of the properties which are joined to accomplish the control of prices do not stand in the names of the parties who are active in the movement. *Stockton* v. *Central Railroad Co., 5 Dick. Ch. Rep. 82.* Nor is it necessary that the illegal combination shall have obtained possession of the whole or nearly all of the particular trade. The control of fifty per cent. of the coal fields and the expectation of the co-operation of the remainder of the producers to effect a change in the price of the output, was held to indicate a purpose to monopolize the trade. *Stockton* v. *Central Railroad Co., 5 Dick. Ch. Rep. 84.*

In the case in hand the complainant proclaimed in its prospectus that by its ownership of the five potteries it had the control of three-fourths of the production of sanitary ware. On securing this control it had kept their separate and majority vote in the potters' association, and thus obtained power to dictate the prices at which the other unbought potteries, should sell their sanitary ware; and finding this dominance threatened by the activity of the Brewer pottery, its owners indicated their continued purpose to maintain its power, by the purchase of the majority of the Brewer company stock, and their deposit of it with the bankers who financiered the complainant, with authority over it so absolute that not even an acknowledgment in writing was taken to show what the bankers were to do with it. Since that time the prices of the Brewer pottery and those of the complainant company have been similar. The power of the complainant over the marketing of sanitary ware, immediately on taking the covenants against competition, must practically have

dominated that business, if it could enforce these covenants and thus keep the vendors of the five potteries out of the trade.

These covenants against competition were all taken at substantially the same time in support of the position of the complainants. By the one now sought to be enforced, the defendants agreed not to " engage in the business of manufacturing pottery ware " for a period of fifty years from this date (July 6th, 1892). The expressed terms show the covenant to be executory, for if it be valid, it may be enforced against any breach which any covenantor may make within fifty years of its date. This very suit is brought to enforce it by restraining the defendants from further breach of its terms. It is plainly yet executory. Like covenants are outstanding against all the others vendors of the potteries now owned by the complainant, when they were obtained; these covenants, if enforced, would have shut out from the business, the larger part of those who were carrying on the trade as proprietors.

The question is presented should this court aid by the use of its process, in the enforcement of covenants arranged as part of a scheme to obtain control over the production and prices of a class of merchandise necessary to the comfort of the community. Contracts of this character may not be illegal in the sense that they are criminal or were prohibited, and yet they may not be enforceable in the courts. As was admirably expressed by Lord Bowen in the court of appeals in *Mogul Steamship Co.* v. *McGregor, 23 Q. B. Div. 619:* " The law does not prohibit the making of such contracts; it merely declines, after they have been made, to recognize their validity. The law considers the disadvantage so imposed upon the contract, a distinct shelter to the public." The case before him was an action for damages for conspiracy to prevent trade and for an injunction against wrongful acts. The complainant was a stranger to an agreement which was attacked on the ground that it tended to create a monopoly and was obnoxious to the freedom of trade. The proceeding sought to restrain the defendants from further action under it, because its operation resulted in loss to the complainant. Lord Bowen declared that no action ever laid at common law against any

individual or individuals for entering into a contract merely because it was in restraint of trade. *Mogul Steamship Co.* v. *McGregor, supra.* As neither malice nor any act in itself unlawful was shown, but only the urgency of a bitter competition in the strife for trade, the judgment that there could be no recovery, was affirmed.

· The question for determination is quite different where one of the parties to the contract tending to create a monopoly in trade seeks to enforce it, as in the present case. There are acts which a man may agree not to do and which he may legally refrain from doing, but which he cannot so bind himself not to do, that the courts will oblige him to abstain. In the class above indicated are all agreements in general restraint of trade—those where the abstention tends to create a monopoly, or to oppress the public. No court would, by its decree, compel a man, for the benefit of the public, to work at his trade or practice his profession, or carry on his business in competition with his rivals; he may, if he likes, agree not to do and may refrain from doing any of these things, no matter how disadvantageous to the community his omission may be, but if it be sought to restrain him by enforcing his agreement in the courts, the question whether the agreement when it was made, was against public policy, will be considered. And this view, involving the protection of the interests of the public, will be taken even if not suggested by the parties. *Richardson* v. *Buhl, ubi supra.*

The transactions which attended upon and resulted in the combination of the five sanitary ware potteries and the formation of the complainant, show the object of the parties to have been to secure power to control the production and dictate the prices of goods of that class, and not only of those made by the complainant, but also by the members of the Sanitary Potters' Association. The covenants to suppress competition—one of which is now sought to be enforced—were part of the same scheme, and indeed, vitally necessary to its success. They were not, from the point of view of their effect upon the public, subsidiary and incidental to each several purchase, but were all simultaneously sought for, obtained and used as a means to reach the

.desired common end—the domination of the trade—and their usefulness in accomplishing this result was exploited in the prospectus of the complainant as a means of increasing the demand for its capital stock.

The prayer for their enforcement is, in my view, an asking that the court shall aid in carrying into effect a scheme which, in all its parts, tended to secure to the complainant company such an undue control of the marketing of a necessity of life, as is against public policy.

I will advise a decree that the complainant's bill be dismissed, with costs.